UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FIRENZE VENTURES LLC, d/b/a FIRENZE–ITALIAN STREET FOOD, on behalf of itself and all others similarly situated,<br><br>         Plaintiff,<br><br>   vs.<br><br>TWIN CITY FIRE INSURANCE COMPANY, d/b/a THE HARTFORD,<br><br>         Defendant. | )<br>)<br>)  20 C 4226<br>)<br>)  Judge Gary Feinerman<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM OPINION AND ORDER**

   Firenze Ventures LLC, a food court vendor in Chicago, alleges in this putative class action that Twin City Fire Insurance Company, its insurer, wrongfully denied coverage for losses that it suffered due to government-ordered shutdowns arising from the COVID-19 pandemic. Doc. 1-1. The complaint alleges breach of Twin City's insurance policy, *id*. at pp. 17-18, ¶¶ 55-61; improper insurance claims practice under § 155 of the Illinois Insurance Code, 215 ILCS 5/155, *id*. at pp. 19-20 ¶¶ 62-67; and unfair and deceptive practices under the Illinois Consumer Fraud Act, 815 ILCS 505/2, *id*. at pp. 20-21 ¶¶ 68-71. Twin City moves to dismiss the complaint under Civil Rule 12(b)(6), arguing that the policy does not cover Firenze's claimed losses. Doc. 16. The motion is granted.

**Background**

   In resolving a Rule 12(b)(6) motion, the court assumes the truth of the operative complaint's well-pleaded factual allegations, though not its legal conclusions. *See Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred

to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Firenze's brief opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013) (internal quotation marks omitted). The facts are set forth as favorably to Firenze as those materials allow. *See Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). In setting forth the facts at the pleading stage, the court does not vouch for their accuracy. *See Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018).

### A.     Firenze's Losses

Firenze operates an "Italian Street Food" deli in the food court at the Metra rail station at Ogilvie Transportation Center in downtown Chicago. Doc. 1-1 at p. 8, ¶ 7. On March 16, 2020, in response to the emerging COVID-19 pandemic, the Governor of Illinois issued Executive Order 2020-07. Doc. 33-1 at 2-7. Executive Order 2020-07 required restaurants to "suspend service for and … not [to] permit on-premises consumption," but "permitted and encouraged [restaurants] to serve food and beverages so that they may be consumed off-premises." *Id.* at 3. The order also allowed "customers [to] enter the premises to purchase food or beverages for carry-out." *Ibid.* On March 20, the Governor issued Executive Order 2020-10, which required all Illinois residents to shelter-in-place and all "non-essential businesses" to close. *Id.* at 9-20. The March 20 order exempted from closure "[r]estaurants and other facilities that prepare and serve food, but only for consumption off-premises, through such means as in-house delivery, third-party delivery, drive-through, curbside pick-up, and carry-out." *Id.* at 14.

Firenze was "forced to halt ordinary operations" due to the executive orders. Doc. 1-1 at p. 13, ¶ 31. The orders "were issued because of the widespread presence of COVID-19 throughout the Chicago metropolitan area, resulting in contamination by the virus of numerous premises." *Id.* at p. 15, ¶ 40. Among those premises was Ogilvie Transportation Center. *Id.* at

pp. 12-14, ¶¶ 28, 34. Following the March 16 order, the food court at Ogilvie was closed to the public. Doc. 33 at 6.

During the period when the food court was closed, Firenze's only business activities were to make sandwiches to donate to hospitals and first responders. *Ibid*. When the food court re-opened in mid-April, customers were permitted to place orders for pick-up, but not to sit down and eat. *Ibid*. Firenze added a delivery service option in early May, and the food court returned to sit-down dining in July. *Ibid*. The months-long disruption in Firenze's business resulted in "substantial lost revenues." Doc. 1-1 at p. 13, ¶ 31.

**B.** **Firenze's Twin City Insurance Policy**

Twin City issued a "Spectrum businessowners' insurance policy" to Firenze for a one-year period beginning on January 8, 2020. *Id*. at p. 10, ¶ 15; *id*. at pp. 25-152. The policy requires Twin City to "pay for direct physical loss or physical damage to Covered Property … caused by or resulting from a Covered Cause of Loss." *Id*. at p. 51. Firenze's deli is designated as the insured premises. *Id*. at p. 38.

**1.** **Pertinent Coverage Provisions**

The policy's "Special Property Coverage Form" sets forth four coverages pertinent to this case: (1) "Business Income"; (2) "Extra Expense"; (3) "Extended Business Income"; and (4) "Civil Authority." *Id*. at pp. 60-61.

The Business Income provision states:

> [Twin City] will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration." The suspension must be caused by direct physical loss of or physical damage to property at the "scheduled premises" … caused by or resulting from a Covered Cause of Loss.

*Id*. at p. 60. The Extra Expense provision states:

3

> [Twin City] will pay reasonable and necessary Extra Expense you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or physical damage to property at the "scheduled premises" … caused by or resulting from a Covered Cause of Loss.

*Ibid*. The Extended Business Income provision grants additional coverage for an insured with a payable claim under the Business Income provision. *Id*. at p. 61. It states that "[Twin City] will pay for the actual loss of Business Income [the insured] incur[s] during the period that [b]egins on the date [its] property is actually repaired, rebuilt, or replaced and 'operations' are resumed," and that ends no more than 30 consecutive days thereafter. *Ibid*.

The Civil Authority provision grants coverage for an "actual loss of Business Income" sustained by the insured "when access to [its] 'scheduled premises' is specifically prohibited by order of a civil authority as the direct result of a Covered Cause of Loss to property in the immediate area of [its] 'scheduled premises.'" *Ibid*. "Civil Authority" coverage is to "begin 72 hours after the order of a civil authority" and "end at the earlier of" two dates: "[1] when access is permitted to [the insured's] 'scheduled premises'; or [2] 30 consecutive days after the order of the civil authority." *Ibid*.

### 2. Virus Exclusion

By endorsement, the Policy sets forth what Twin City calls the "Virus Exclusion," which states:

> [Twin City] will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss:
>
> (1) Presence, growth, proliferation, spread or any activity of "fungi," wet rot, dry rot, bacteria or virus.
>
> (2) But if "fungi," wet rot, dry rot, bacteria or virus results in a "specified cause of loss" to Covered Property, we will pay for the loss or damage caused by that "specified cause of loss."

*Id*. at p. 118.  By its terms, the Exclusion excludes from coverage loss or damage caused by "'fungi,' wet rot, dry rot, bacteria or virus."  *Ibid*.  But the Exclusion does not apply if the "virus results in a 'specified cause of loss' to Covered Property" that in turn causes the claimed loss or damage.  *Ibid*.  Nor does the Exclusion apply "[w]hen [the] virus results from fire or lightning" or "[t]o the extent that coverage is provided in the Additional Coverage – Limited Coverage for 'Fungi', Wet Rot, Dry Rot, Bacteria and Virus with respect to loss or damage by a cause of loss other than fire or lightning."  *Ibid*.

The policy proceeds to set forth the terms of the "Limited Coverage for 'Fungi', Wet Rot, Dry Rot, Bacteria and Virus" coverage, which effectively serves as an exception to the Virus Exclusion.  *Id*. at pp. 119-120.  As pertinent here, the Limited Coverage provision applies when two criteria are satisfied.  First, the "virus [must be] the result of … a 'specified cause of loss' other than fire or lightning" or the result of an "[e]quipment [b]reakdown."  *Id*. at p. 119.  Second, the "loss or damage by … virus" must consist of "[d]irect physical loss or direct physical damage to Covered Property caused by … virus."  *Ibid*.  The policy's definition of "specified cause of loss" is set forth below.

### C.   Twin City's Denial of Firenze's Claim

Firenze made a claim for its loss of business income in March 2020.  *Id*. at p. 14, ¶ 33; *id*. at pp. 154-159.  Twin City denied the claim.  *Ibid*.

### Discussion

The parties agree that all of Firenze's claims rise or fall with its claim that Twin City breached the insurance policy by denying coverage.  Doc. 16 at 11-12; Doc. 33 at 15.  The parties further agree that Illinois law governs interpretation of the Twin City policy.  Doc. 16 at 5 n.3; Doc. 33 at 7-8.

5

In Illinois, the interpretation of an insurance policy is a question of law. *See Rich v. Principal Life Ins. Co.*, 875 N.E.2d 1082, 1089 (Ill. 2007). "Like any contract, an insurance policy is to be construed as a whole, giving effect to every provision, if possible, because it must be assumed that every provision was intended to serve a purpose." *Valley Forge Ins. Co. v. Swiderski Elecs., Inc.*, 860 N.E.2d 307, 314 (Ill. 2006). "[The court's] primary function is to ascertain and give effect to the intention of the parties, as expressed in the policy language." *Founders Ins. Co. v. Munoz*, 930 N.E.2d 999, 1003 (Ill. 2010). "Although policy terms that limit an insurer's liability will be liberally construed in favor of coverage, this rule of construction only comes into play when the policy is ambiguous." *Rich*, 875 N.E.2d at 1090 (quoting *Hobbs v. Hartford Ins. Co. of the Midwest*, 823 N.E.2d 561, 564 (Ill. 2005)). "While [the court] will not strain to find an ambiguity where none exists, neither will [it] adopt an interpretation which rests on gossamer distinctions that the average person, for whom the policy is written, cannot be expected to understand." *Founders Ins. Co.*, 930 N.E.2d at 1004 (internal quotation marks and citation omitted).

Twin City seeks dismissal of Firenze's policy breach claim solely on the ground that the Virus Exclusion precludes coverage for Firenze's claimed losses. Doc. 16 at 6-11. Firenze responds that its losses are covered by the exception to the Virus Exclusion set forth in the Limited Coverage provision. Doc. 33 at 9-15. Twin City's motion thus turns on whether Firenze's losses are covered by the Limited Coverage provision. As noted, that provision applies only if: (1) the virus is "the result of" a "specified cause of loss" other than fire or lightning or "the result of" an "[e]quipment [b]reakdown"; and (2) the insured's claim is for "[d]irect physical loss or direct physical damage to Covered Property caused by … virus." Doc. 1-1 at p. 119. Firenze cannot satisfy either requirement.

6

A. **Result of a Specified Cause of Loss**

The policy defines "specified cause of loss" as: "Fire; lightning; explosion, windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet[,] [and] water damage." *Id.* at p. 75. Firenze contends that the pertinent "specified cause of loss" here is "aircraft or vehicles," reasoning that the "COVID-19 virus was introduced and spread to the Chicago area by aircraft passengers from China," and that "the [infected] business premises in the Chicago metropolitan area … included Metra facilities and rail vehicles." Doc. 33 at 12 (citing Doc. 1-1 at pp. 12-14, ¶¶ 27-28, 34); *see also* Doc. 1-1 at p. 14, ¶ 34 (alleging that "the virus was introduced into the United States on board one or more aircraft from China and contaminated the railway cars, personnel and other facilities of the Metra system," and that Firenze's "business was located within one of the main Metra terminals in downtown Chicago").

Firenze's reading of the "specified cause of loss" requirement is unrealistically broad. At the motion hearing, Doc. 51, Firenze went so far as to suggest that viral contamination will virtually always be "the result of" "aircraft or vehicles" for purposes of the Limited Coverage provision, excepting the hypothetical case of a Patient Zero who introduces the virus to the site of contamination by walking there. Firenze's inability to state any principled limit to its reading of the "specified cause of loss" requirement is, to say the least, a red flag. *See Beyer v. Heritage Realty, Inc.*, 251 F.3d 1155, 1158 (7th Cir. 2001) (rejecting a party's "absurdly broad" interpretation of an insurance policy term).

More to the point, Firenze's reading of the phrase "the result of" in the Limited Coverage provision is inconsistent with the phrase's meaning in common parlance. *See Henderson v. Newland*, 197 N.E.2d 21, 22 (Ill. 1964) (holding that an insurance contract's exclusion of liability for the towing of a trailer did not apply to the towing of an automobile, reasoning that

"[a] towed automobile is not considered a 'trailer' in common parlance"). The fact that human beings use various conveyances to travel from Point A to Point B does not mean that anything caused by what they do (intentional or not) at Point B is "the result of" the conveyance they used. If a person catches a cold in New York one night, flies to Chicago the next morning, takes an Uber downtown to her hotel, and then sneezes on her bellhop in the elevator, no speaker of ordinary English would say that the bellhop's ensuing cold was "the result of" the aircraft or the Uber.

In holding that Firenze's claimed loss does not satisfy the "the result of … a 'specified cause of loss'" requirement of the Limited Coverage provision, the court joins other courts to have interpreted comparable policy language in the same manner. *See, e.g.*, *Franklin EWC, Inc. v. Hartford Fin. Servs. Grp., Inc.*, 488 F. Supp. 3d 904, 910 (N.D. Cal. 2020) ("[Having failed to allege[] that the virus was caused by any of the specified causes of loss … Plaintiffs have failed to meet their burden in showing that the business losses are covered under the Policy's Limited Virus exception to the Virus Exclusion."); *Wilson v. Hartford Cas. Co.*, 2020 WL 5820800, at *8 (E.D. Pa. Sept. 30, 2020) ("Plaintiffs do not attempt to plead any factual allegations that would allow the Court to reasonably infer that the virus is a result of a 'specified cause of loss' or equipment breakdown."). None of the many decisions brought to the court's attention by Firenze, Docs. 33, 43, 53, 56, 64, 71, 75, 79, 81-82, has adopted its unrealistic and extraordinarily broad reading of comparable "the result of … a 'specified cause of loss'" policy language.

Contrary to Firenze's submission, Doc. 33 at 13, the court's interpretation of that policy language does not render illusory the Limited Coverage provision. To be sure, it may be highly unlikely for, say, a vehicle to crash into and puncture a water pipe connected to the insured's

premise, leading to a fungal outbreak. But materially identical coverage provisions can apply, and have applied, in easily imaginable circumstances. *See Martz v. Leading Ins. Grp. Ins. Co.*, 2014 WL 3749711, at \*1-4 (N.D. Cal. July 29, 2014) (holding that mold damage, which the parties agreed constituted "fungi" within the meaning of a "Limited Coverage For 'Fungi', Wet Rot Or Dry Rot" provision, could be the "result of" "water damage," a pertinent "specified cause of loss" under the policy); *WPB No. 1, LLC v. Valley Forge Ins. Co.*, 2007 WL 9702161, at \*2-4 (S.D. Cal. Mar. 27, 2007) (holding that a "Limited Coverage for 'Fungus,' Wet Rot, Dry Rot and Bacteria" provision covered mold damage following a hurricane). In any event, the fact that a policy provision covers an uncommon set of occurrences does not make coverage under the provision illusory, as one important purpose of an insurance policy is to protect against harms that may be out of the ordinary. *See Am. Country Ins. Co. v. Kraemer Bros.*, 699 N.E.2d 1056, 1062 (Ill. App. 1998) (rejecting the argument that "coverage was illusory because it is difficult to imagine any factual scenario" in which it would apply, reasoning that coverage is not "illusory" under Illinois law merely because the covered circumstances are uncommon); *see also Liberty Mut. Fire Ins. Co. v. Statewide Ins. Co.*, 352 F.3d 1098, 1100-01 (7th Cir. 2003) (citing with approval that passage from *Kraemer Bros.*). That principle holds true for the Limited Coverage provision. *See Westside Head & Neck v. The Hartford Fin. Servs. Grp.*, 2021 WL 1060230, at \*5 (C.D. Cal. Mar. 19, 2021) (ruling that the Limited Coverage provision is not "illusory," reasoning that "[t]here is no requirement that each peril[—fungi, wet rot, dry rot, bacteria, and virus—]potentially be the result of each and every specified cause of loss" or "that every specified cause of loss must result in a peril set out in the additional Limited Coverage," and adding that the insured's "assertion that a virus could never be caused directly or indirectly by any of the specified causes of loss is not plausible"); *Ultimate Hearing Sols. II, LLC v. Twin City*

9

*Fire Ins. Co.*, 2021 WL 131556, at *9 (E.D. Pa. Jan. 14, 2021) (rejecting the argument that the "Limited Virus Coverage" in the Twin City Policy is "illusory").

## B.     Direct Physical Loss or Direct Physical Damage to Covered Property

Firenze also cannot satisfy the Limited Coverage provision's second requirement, that its claimed loss be for "[d]irect physical loss or direct physical damage to Covered Property."  Doc. 1-1 at p. 119.  The reason is plain: Firenze does not allege that the COVID-19 virus was physically present at its deli, the only premises identified in the policy's declarations.  *Id*. at p. 38; *see id*. at p. 51 (defining "Covered Property" to "mean[] the following types of property for which a Limit of Insurance is shown in the Declarations").  There accordingly has been no direct physical loss or direct physical damage to Covered Property.  *See 4431, Inc. v. Cincinnati Ins. Cos.*, __ F. Supp. 3d __, 2020 WL 7075318, at *11 (E.D. Pa. Dec. 3, 2020) ("[F]or Plaintiffs to assert an economic loss resulting from their inability to operate their premises as intended within the coverage of the Policy's "physical loss" provision, the loss and the bar to operation from which it results must bear a causal relationship to some *physical condition* of or on the premises.").

In an effort to evade that problem, Firenze contends that the Limited Coverage provision must be read in conjunction with the policy's Civil Authority provision.  Doc. 33 at 4, 14-15.  Specifically, Firenze maintains that the "combined effect" of those two provisions is that "Twin City has to pay for the loss of business income and necessary extra expense caused by an 'order of a civil authority' issued when property *other than the insured's premises*, but in its 'immediate area,' is contaminated by a virus."  *Id*. at 4 (emphasis added); *see also* Doc. 1-1 at pp. 12-14, ¶¶ 27-20, 34 (alleging that the COVID-19 virus contaminated "numerous business premises in the Chicago metropolitan area," as well as "the railway cars, personnel and other facilities of the Metra system").  That argument fails to persuade.

10

As an initial matter, it is doubtful that the Limited Coverage provision incorporates the Civil Authority provision in the manner posited by Firenze. Firenze's support for reading the two provisions together rests on the following reference in the Limited Coverage provision to "Time Element Coverage":

> The following applies only if a Time Element Coverage applies to the "scheduled premises" and only if the suspension of "operations" satisfies all the terms and conditions of the applicable Time Element Coverage.
>
> (1) If the loss which resulted in "fungi," wet or dry rot, bacteria or virus does not in itself necessitate a suspension of "operations," but such suspension is necessary due to loss or damage to property caused by "fungi," wet or dry rot, bacteria or virus, then our payment under the Time Element Coverage is limited to the amount of loss and expense sustained in a period of not more than 30 days unless another number of days is indicated in the Declarations. …

Doc. 1-1 at pp. 119-120. While the policy does not define "Time Element Coverage," Firenze contends that it is a property insurance term referring to a class of coverages for business interruption. Doc. 38 at 2. Firenze asserts that the four coverages referenced in the Background section above—"Business Income," "Extra Expense," "Extended Business Income," and "Civil Authority"—fall into that bucket. *Ibid.*

The policy's plain terms undercut Firenze's argument that Civil Authority coverage is an "applicable Time Element Coverage" within the meaning of the Limited Coverage provision. Doc. 1-1 at pp. 119-120. By its express terms, the Time Element Coverage component of the Limited Coverage Provision applies only if there has been "a suspension of 'operations.'" *Id.* at p. 119. The Business Income, Extra Expense, and Extended Business Income coverages likewise apply when there has been a "suspension" of "operations." *Id.* at p. 60 ("[Twin City] will pay for the actual loss of Business Income you sustain due to the necessary suspension of your 'operations' during the 'period of restoration.'"); *ibid.* (defining "Extra Expense" coverage to include "expense incurred [t]o avoid or minimize the suspension of business and to continue

11

'operations'"); *id.* at p. 61 (providing "Extended Business Income" coverage "[i]f the necessary suspension of your 'operations' produces a Business Income loss"). By contrast, Civil Authority coverage is pegged not to "a suspension of 'operations,'" but rather to the "prohibit[ion]" of "access" to the insured's premises. *Id.* at p. 61. It follows that Civil Authority coverage, unlike the other three coverages, is not a Time Element Coverage, which fatally undermines the premise underlying Firenze's contention that the Limited Coverage provision incorporates the Civil Authority provision. *See United Am. Ins. Co. v. Wibracht*, 825 F.2d 1196, 1203 (7th Cir. 1987) (presuming that differently worded provisions in an insurance policy carry different meanings).

In any event, even if the Limited Coverage provision incorporated the Civil Authority provision, Firenze's claimed losses do not implicate the Civil Authority coverage. Two conditions must be satisfied for Civil Authority coverage to apply: (1) an "order of a civil authority" must have "specifically prohibited" "access" to the insured premises, *i.e.*, Firenze's deli; and (2) the order must have been "the direct result of a Covered Cause of Loss to property in the [insured premise's] immediate area." Doc. 1-1 at p. 61. It is doubtful that the second condition is satisfied, as the complaint alleges that the Governor's closure orders "were issued because of the widespread presence of COVID-19 *throughout the Chicago metropolitan area*," *Id.* at p. 15, ¶ 40 (emphasis added), not in any particular location or locations in the "immediate area" surrounding the deli.

The first condition definitely has not been satisfied. The Governor's first closure order expressly "permitted and encouraged [restaurants] to serve food and beverages so that they may be consumed off-premises." Doc. 33-1 at 3. And the second closure order expressly allowed restaurants to "prepare and serve food … for consumption off-premises, through such means as in-house delivery, third-party delivery, drive-through, curbside pick-up, and carry-out." *Id.* at

14. (Indeed, Firenze admits that it made sandwiches at its deli immediately following both closure orders, and that it later fulfilled pick-up and delivery orders on-site. Doc. 33 at 6.) Accordingly, the closure orders indisputably did not "specifically prohibit[]" "access" to Firenze's premises, Doc. 1-1 at p. 61, which renders inapplicable the Civil Authority coverage.

In pressing the opposite result, Firenze observes that the closure orders "prohibited the public from accessing Firenze's establishment in the manner members of the public *normally* accessed" it—namely, "by entering and sitting while consuming food and drink, remaining for substantial periods of time." Doc. 33 at 15 (emphasis added). By its terms, though, the Civil Authority provision does not provide coverage when only *normal* access to the insured's premise is prohibited. The provision speaks in terms of government orders that "prohibit" "access," period, not those that allow some kinds of access while prohibiting others. *Cf.* Doc. 1-1 at pp. 60-61 (in the Business Income, Extra Expense, and Extended Business Income coverages, defining "suspension" to mean, among other things, "[t]he *partial slowdown or* complete cessation of [the insured's] business activities") (emphasis added). It follows that the prohibition of normal access does not trigger coverage under the Civil Authority provision. *See 1210 McGavock St. Hosp. Partners, LLC v. Admiral Indem. Co.*, __ F. Supp. 3d __, 2020 WL 7641184, at *10 (M.D. Tenn. Dec. 23, 2020) ("The most natural reading of 'access,' in this context, is physical access, not simply being closed to the public. The plaintiff does not allege that it was ever physically unable to access the restaurant.").

## Conclusion

Twin City's motion to dismiss is granted. Although it is difficult to imagine how Firenze might cure the deficiencies in its complaint, it will be given one chance to replead. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519 (7th Cir. 2015)

("Ordinarily, … a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend … .").  The complaint is dismissed without prejudice, and Firenze is given until April 21, 2021, to file an amended complaint.  If Firenze does not do so, the dismissal will convert automatically to a with-prejudice dismissal and judgment will be entered.

March 31, 2021

_____
United States District Judge