UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FIRENZE VENTURES LLC, d/b/a FIRENZE–ITALIAN STREET FOOD, on behalf of itself and all others similarly situated, | )<br>)<br>)<br>)   20 C 4226<br>) |
| Plaintiff, | )   Judge Gary Feinerman<br>) |
| vs. | )<br>) |
| TWIN CITY FIRE INSURANCE COMPANY, d/b/a THE HARTFORD, | )<br>)<br>)<br>) |
| Defendant. | ) |

**M<span style="font-variant:small-caps">EMORANDUM</span> O<span style="font-variant:small-caps">PINION AND</span> O<span style="font-variant:small-caps">RDER</span>**

Firenze Ventures LLC, a food court vendor in Chicago, alleges in this putative class action that Twin City Fire Insurance Company, its insurer, wrongfully denied coverage for losses it suffered due to government-ordered shutdowns arising from the COVID-19 pandemic. Doc. 85. Earlier this year, the court dismissed the initial complaint without prejudice, Docs. 83-84 (reported at 532 F. Supp. 3d 607 (N.D. Ill. 2021)), and granted Firenze leave to file an amended complaint, which it has done, Doc. 85. As did the initial complaint, the amended complaint alleges breach of Twin City's insurance policy, improper insurance claims practices under § 155 of the Illinois Insurance Code, 215 ILCS 5/155, and deceptive practices under the Illinois Consumer Fraud Act ("ICFA"), 815 ILCS 505/2. Twin City moves to dismiss the amended complaint under Civil Rule 12(b)(6). Doc. 88. The motion is granted, and judgment will be entered in Twin City's favor.

**Background**

In resolving a Rule 12(b)(6) motion, the court assumes the truth of the operative complaint's well-pleaded factual allegations, though not its legal conclusions. *See Zahn v. N.*

1

*Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Firenze's brief opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013) (internal quotation marks omitted). The facts are set forth as favorably to Firenze as those materials allow. *See Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). In setting forth the facts at the pleading stage, the court does not vouch for their accuracy. *See Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018).

Firenze operates a deli in the food court at the Metra rail station at Ogilvie Transportation Center in downtown Chicago. Doc. 85 at ¶ 7. In March 2020, in response to the "widespread presence of COVID-19 throughout the Chicago metropolitan area," the Governor of Illinois issued executive orders requiring restaurants in Illinois to suspend in-person dining. *Id*. at ¶¶ 70-71, 87; *see* Doc. 85-1 at pp. 132, 140. The closure orders closed the seating area of the food court, Doc. 85 at ¶ 72, and "forced [Firenze] to halt ordinary operations, resulting in substantial lost revenues," *id*. at ¶ 76. The orders did allow restaurants to prepare and serve food for off-premises consumption by means of pickup and delivery. *Id*. at ¶¶ 70-71; *see* Doc. 85-1 at pp. 132, 140.

COVID-19 virus particles were present at "[n]umerous business premises in the Chicago metropolitan area," including Metra railcars and stations, the Ogilvie food court, and Firenze's deli. Doc. 85 at ¶¶ 63-67. COVID-19 particles "adhere[] to surfaces and objects, harming and physically changing and physically altering those objects by becoming a part of their surface and making physical contract with them unsafe for their ordinary and customary use." *Id*. at ¶ 55.

Specifically, "[t]he presence of COVID-19 transforms everyday surfaces and objects into fomites, causing a tangible change of the property into a transmission vehicle for disease." *Id*. at ¶ 54. "'Fomites' are physical objects or materials that carry[] and are capable of transmitting infectious agents." *Id*. at ¶ 50.

Firenze held a commercial business owner's policy issued by Twin City, *id*. at ¶ 17, the pertinent terms of which are set forth below. Firenze submitted an insurance claim for the lost business income and extra expenses it incurred due to the closure orders, which Twin City denied. *Id*. at ¶¶ 76, 78, 91-93.

## Discussion

Firenze seeks a declaratory judgment that the Twin City policy provides coverage and damages for Twin City's alleged breach of contract. *Id*. at ¶¶ 103-109. Firenze also seeks a penalty for Twin City's alleged vexatious and unreasonable denial of coverage under 215 ILCS 5/155, *id*. at ¶¶ 110-115, and actual and punitive damages for Twin City's alleged deceptive conduct under ICFA, *id*. at ¶¶ 116-119.

**I.      Coverage Claim**

The meaning of a written contract "is generally a question of law for the court." *Stampley v. Altom Transp., Inc.*, 958 F.3d 580, 586 (7th Cir. 2020) (alterations omitted). The parties agree that Illinois law governs interpretation of the Twin City policy. Doc. 88 at 5 n.3; Doc. 90 at 4.

Under Illinois law, an insurance policy, like any contract, "is to be construed as a whole, giving effect to every provision, if possible, because it must be assumed that every provision was intended to serve a purpose." *Valley Forge Ins. Co. v. Swiderski Elecs., Inc.*, 860 N.E.2d 307, 314 (Ill. 2006). "[The court's] primary function is to ascertain and give effect to the intention of the parties, as expressed in the policy language." *Founders Ins. Co. v. Munoz*, 930 N.E.2d 999,

3

1003 (Ill. 2010). "Although policy terms that limit an insurer's liability will be liberally construed in favor of coverage, this rule of construction only comes into play when the policy is ambiguous." *Rich v. Principal Life Ins. Co.*, 875 N.E.2d 1082, 1090 (Ill. 2007) (quoting *Hobbs v. Hartford Ins. Co. of the Midwest*, 823 N.E.2d 561, 564 (Ill. 2005)). "While [the court] will not strain to find an ambiguity where none exists, neither will [it] adopt an interpretation which rests on gossamer distinctions that the average person, for whom the policy is written, cannot be expected to understand." *Munoz*, 930 N.E.2d at 1004 (internal quotation marks and citation omitted).

Firenze asserts coverage under four provisions of the Twin City policy: the "Business Income" provision; the "Extended Business Income" provision; the "Extra Expense" provision; and the "Civil Authority" provision. Doc. 85 at ¶¶ 40-41; Doc. 90 at 10-16; Doc. 85-1 at pp. 37-38, § A.5.o, .p, .q, .r. Twin City contends that none of those provisions applies, Doc. 88 at 12-16, and adds that even if any does apply, the policy's Virus Exclusion defeats coverage, *id*. at 6-12; Doc. 85-1 at p. 95, § A.2.i. Because none of the coverage provisions applies, there is no need to address the virus exclusion.

### A. Business Income Provision

The policy states that Twin City "will pay for direct physical loss of or physical damage to Covered Property at [Firenze's] premises … caused by or resulting from a Covered Cause of Loss." Doc. 85-1 at p. 28, § A. As noted, Firenze seeks coverage under the policy's Business Income provision, which states in relevant part:

> [Twin City] will pay for the actual loss of Business Income [Firenze] sustain[s] due to the necessary suspension of [its] "operations" during the "period of restoration." The suspension *must be caused by direct physical loss of or physical damage to property* at [Firenze's premises] … caused by or resulting from a Covered Cause of Loss.

4

*Id*. at p. 37, § A.5.o(1) (emphasis added). "Business Income," in turn, is defined as the "[n]et [i]ncome … that would have been earned or incurred if no direct physical loss or physical damage had occurred," plus normal operating expenses that continue to accrue. *Id*. at p. 37, § A.5.o(4).

Twin City contends that Firenze's suspension of operations was caused not by physical loss or damage to its property, but by the Governor's statewide closure orders. Doc. 88 at 13-14. Firenze agrees that it suspended operations due to the closure orders, Doc. 85 at ¶¶ 76, 88, 91; Doc. 90 at 8-9, but advances two theories for why the suspension was nonetheless caused by direct physical loss of or physical damage to its property. First, Firenze contends that the closure orders' prohibition on in-person dining caused a "direct physical loss of use of [its] facilities." Doc. 90 at 9. Second, Firenze posits that the orders were implemented due to the presence of COVID-19 particles at its property, *id*. at 8, 11, 16, which, according to Firenze, qualifies as "physical property damage," Doc. 85 at ¶ 68; Doc. 90 at 6-8. Neither theory succeeds.

### 1. Closure Orders Theory

Firenze contends that the Governor's closure orders "specifically prohibited any use of certain property (like seating in dining areas) resulting in the physical loss of"—though not "damage to"—"that property for a period of time." Doc. 90 at 7. Twin City takes the contrary view, arguing that closure orders causing the loss of use of covered property "do not trigger coverage under policies that require direct physical loss or damage." Doc. 88 at 13 (citing *Chief of Staff LLC v. Hiscox Ins. Co.*, 532 F. Supp. 3d 598, 601-05 (N.D. Ill. 2021)); Doc. 91 at 9-10. Twin City's reading is correct.

True enough, the noun "loss," standing alone, can refer to "depriv[ation] of … a possession." *Loss*, *Oxford English Dictionary* (2d ed. 1989) (def. 2a); *see also Loss*, *Webster's*

5

*Third New International Dictionary* (1961) (def. 1a) ("the act or fact of losing," "failure to keep possession," "deprivation"). But the noun "loss" in the policy is modified by the adjective "physical," which in context means "tangible, concrete." *Physical*, *Oxford English Dictionary* (3d ed. updated Mar. 2006) (def. 6); *see also Physical*, *Black's Law Dictionary* (11th ed. 2019) (def. 2) ("pertaining to real, tangible objects"); *Physical*, *Webster's Third New International Dictionary*, *supra* (def. 2b) ("of or relating to natural or material things as opposed to things mental, moral, spiritual, or imaginary"). So "physical loss" refers not to *any* deprivation, but rather to a deprivation caused by a tangible or concrete change in the condition or location of the thing that is lost.

The complaint alleges no such deprivation. Instead, it alleges that Firenze's loss of use of its property was due to the Governor's closure orders. Doc. 85 at ¶¶ 76, 88, 91. Those closure orders did not cause a concrete or tangible "loss of" Firenze's property. *See* 10A Steven Plitt *et al.*, *Couch on Insurance* § 148:46 (West 3d ed. updated June 2021) ("The requirement that the loss be 'physical,' given the ordinary definition of that term, is widely held to exclude alleged losses that are intangible or incorporeal and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property.") (footnotes omitted); *accord, e.g.*, *Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*, 15 F.4th 885, 890-93 (9th Cir. 2021) (California law); *Santo's Italian Café LLC v. Acuity Ins. Co.*, 15 F.4th 398, 400-06 (6th Cir. 2021) (Ohio law); *Oral Surgeons, P.C. v. Cincinnati Ins. Co.*, 2 F.4th 1141, 1144-45 (8th Cir. 2021) (Iowa law). It follows that Firenze did not suffer the "physical loss" required for coverage under the Business Income provision.

Another strike against Firenze's position is that it is difficult to square with the Business Income provision's "period of restoration" language. As noted, the provision covers losses "due to the necessary suspension of [Firenze's] 'operations' during the 'period of restoration.'" Doc. 85-1 at p. 37, § A.5.o(1). As defined by the policy, the "period of restoration" ends when (a) "[t]he property at [Firenze's premises] should be repaired, rebuilt or replaced with reasonable speed and similar quality" or (b) "[t]he date when [Firenze's] business is resumed at a new, permanent location." *Id*. at p. 51, § G.12.b.

If there had been a physical alteration to the condition or location of Firenze's property—for example, if a fire destroyed its kitchen, or if a thief stole its sandwich press—one could assess when the "period of restoration" would end, for in those instances there would be something to "repair[], rebuil[d] or replace[]." *Ibid*. The same cannot be said of the mere loss of use of Firenze's property due to government closure orders. Under Firenze's theory—that the mere loss of use of property at its premises, without any physical alteration to the condition or location of that property, is covered—when would the period of restoration end? That question is unanswerable, for if there has been no physical alteration to the property's condition or location, there is nothing to "repair[], rebuil[d] or replace[]." *Ibid*. Nor is there any reason to expect that, absent some physical alteration to property at Firenze's premises, the business would have to resume at "a new permanent location." *Ibid*. The dissonance between the "period of restoration" language, which is critical to application of the Business Income provision, and Firenze's interpretation of the provision confirms that the correct reading is the one requiring some physical change in the condition or location of property at the insured's premises. *See, e.g.*, *Mudpie*, 15 F.4th at 892 (California law) ("That this coverage extends only until covered property is repaired, rebuilt, or replaced, or the business moves to a new permanent location[,]

7

suggests [that] the Policy contemplates providing coverage only if there are physical alterations to the property."); *Chief of Staff*, 532 F. Supp. 3d at 602-03 (Connecticut law) (similar); *Phila. Parking Auth. v. Fed. Ins. Co.*, 385 F. Supp. 2d 280, 287 (S.D.N.Y. 2005) (Pennsylvania law) ("'Rebuild,' 'repair' and 'replace' all strongly suggest that the damage contemplated by the Policy is physical in nature.").

In sum, the policy's Business Income provision does not apply where, as here, government closure orders prohibit use of a business's premises for reasons unconnected to any change in the physical condition of the premises or in the physical condition or location of property at the premises. In so holding, this court joins the many other courts to have interpreted materially identical provisions in the same manner. *See*, *e.g.*, *Mudpie*, 15 F.4th at 892 (California law) ("Mudpie alleges the Stay at Home Orders temporarily prevented Mudpie from operating its store as it intended, and urges us to interpret 'direct physical loss of or damage to' to be synonymous with 'loss of use.' We cannot endorse Mudpie's interpretation because California courts have carefully distinguished 'intangible,' 'incorporeal,' and 'economic' losses from 'physical' ones."); *Santo's Italian Café*, 15 F.4th at 402 (Ohio law) ("The Governor's shut-down orders … did not create a direct physical loss of property or direct physical damage to it. They simply prohibited one use of the property—in-person dining—while permitting takeout dining and through it all did not remotely cause direct physical damage to the property. … A loss of use simply is not the same as a physical loss."); *Oral Surgeons*, 2 F.4th at 1144 (Iowa law) ("The policy here clearly requires direct 'physical loss' or 'physical damage' to trigger business interruption and extra expense coverage. Accordingly, there must be some physicality to the loss or damage of property—*e.g.*, a physical alteration, physical contamination, or physical destruction."); *Dakota Ventures, LLC v. Oregon Mut. Ins. Co.*, __ F. Supp. 3d __, 2021 WL

3572657, at *9 (D. Or. Aug. 11, 2021) (Oregon law) ("[T]he multitude of cases interpreting identical and similar language make clear that 'direct physical loss of or damage to property' does not include a 'loss of functionality' of undamaged property for its intended purpose."), *appeal docketed*, No. 21-35758 (9th Cir. Sept. 9, 2021); *Off. Sol. Grp., LLC v. Nat'l Fire Ins. Co. of Hartford*, __ F. Supp. 3d __, 2021 WL 2403088, at *7 (S.D.N.Y. June 11, 2021) (New York law) ("New York [federal district] courts have consistently maintained that 'direct physical loss of or damage' language requires physical damage to invoke coverage, and that loss of use due to the pandemic does not constitute physical damage when the covered property was physically unharmed by the virus.") (collecting cases); *Berkseth-Rojas v. Aspen Am. Ins. Co.*, 513 F. Supp. 3d 724, 732 (N.D. Tex. 2021) (Minnesota law) ("[D]irect physical loss or damage requires something more than mere loss of use or function."); *Water Sports Kauai, Inc. v. Fireman's Fund Ins. Co.*, 499 F. Supp. 3d 670, 677 (N.D. Cal. 2020) (Hawaii law) ("Numerous courts have found that materially identical allegations [of loss of use] do not trigger coverage under similarly worded policies as a result of government closure orders. The cases consistently conclude that there needs to be some *physical* tangible injury (like a total deprivation of property) to support 'loss of property' or a *physical* alteration or active presence of a contaminant to support 'damage to' property.") (collecting cases); *Real Hosp., LLC v. Travelers Cas. Ins. Co. of Am.*, 499 F. Supp. 3d 288, 295 (S.D. Miss. 2020) (Mississippi law) ("Plaintiff's contention that 'loss of property' reasonably includes loss of usability is not sustainable.").

The court acknowledges that several district court decisions have interpreted similar insurance policy provisions to cover, or at least possibly cover, losses due to government COVID-19 closure orders. *See, e.g.*, *Seifert v. IMT Ins. Co.*, __ F. Supp. 3d __, 2021 WL 2228158, at *5 (D. Minn. June 2, 2021) (Minnesota law); *Derek Scott Williams PLLC v.*

9

*Cincinnati Ins. Co.*, 522 F. Supp. 3d 457, 462-64 (N.D. Ill. 2021) (Texas law); *In re Soc'y Ins. Co. COVID-19 Bus. Interruption Prot. Ins. Litig.*, 521 F. Supp. 3d 729, 741-43 (N.D. Ill. 2021) (Illinois, Wisconsin, Minnesota, and Tennessee law). But disagreement among courts regarding the interpretation of a policy provision does not, by itself, render the provision ambiguous. *See Erie Ins. Grp. v. Sear Corp.*, 102 F.3d 889, 894 (7th Cir. 1996) (rejecting the argument that an insurance policy term was ambiguous "on the basis of conflicting case law" interpreting the term); *TMW Enters. v. Fed. Ins. Co.*, 619 F.3d 574, 580 (6th Cir. 2010) ("[A] disagreement among three judges about whether a contractual provision is ambiguous does not establish that it is ambiguous … ."); *City of Austin v. Decker Coal Co.*, 701 F.2d 420, 426 n.17 (5th Cir. 1983) ("[T]he fact that courts may disagree as to the import of a contract term does not, by that fact alone, mean that it is ambiguous."); *Cont'l Ins. Co. v. Bones*, 596 N.W.2d 552, 556-58 (Iowa 1999) (holding a policy provision to be unambiguous even though other courts had interpreted similar provisions differently). Those decisions therefore do not preclude the court's rejection of Firenze's closure orders theory on a Rule 12(b)(6) motion.

        2.        **COVID-19 Particles Theory**

Firenze's second theory is that COVID-19 particles were physically present at, and inflicted "physical[] damage[]" on, its property. Doc. 90 at 6-8; Doc. 85 at ¶ 68. In support, Firenze contends in its brief that the "substantial risk that the virus was at the restaurant (or would be through normal use) resulted in Governor Pritzker imposing executive orders prohibiting the direct physical use of indoor dining areas, which resulted in Firenze's loss of income." Doc. 90 at 8; *see also id*. at 16 ("[T]he executive orders prohibited Firenze from using its insured property because of the reasonable suspicion that the virus had contaminated its property."). Twin City responds that the virus's presence at Firenze's property does not qualify

10

as "physical damage," Doc. 88 at 9-10; Doc. 91 at 5-8, and disputes as "disingenuous[]" Firenze's allegation that the Governor's closure orders were motivated by the possible presence of virus at its premises, Doc. 91 at 11-12.

To support its argument that COVID-19 particles inflict physical damage on property, Firenze analogizes COVID-19 particles to asbestos fibers, noting that the Supreme Court of Illinois held in *United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.*, 578 N.E.2d 926, 931-32 (Ill. 1991), that "[c]ontamination by toxic material is 'direct physical loss.'" Doc. 90 at 8. Many decisions have rejected the analogy between COVID-19 particles and asbestos, reasoning that any damage inflicted by COVID-19 is temporary rather than the kind of permanent damage caused by asbestos. *See*, *e.g.*, *Albuquerque Ambulatory Eye Surgery Ctr. LLC v. Transp. Ins. Co.*, 2021 WL 4746306, at *8-9 (D.N.M. Oct. 12, 2021) (New Mexico law) (rejecting the analogy to asbestos, and holding that "allegations of the presence of coronavirus in the insured premises, alone, are insufficient to trigger coverage" because "contamination that is temporary or that which may be remedied without preventing use of the building has generally not been found to qualify as direct physical loss to the insured premises"); *Troy Stacy Ents. Inc. v. Cincinnati Ins. Co.*, __ F. Supp. 3d __, 2021 WL 4346688, at *7 (S.D. Ohio Sept. 24, 2021) (Minnesota law) ("The presence of SARS-CoV-2 [] is not like asbestos, pesticides, or smoke. The latter contaminants may seriously impair or destroy a property's function and value. The virus, by contrast, is easily eliminated with routine cleaning procedures. … Indeed, the Complaint acknowledges that the virus, if not eliminated with cleaning, goes away naturally after a period of days.") (internal quotation marks omitted), *appeal docketed*, No. 21-4008 (6th Cir. Nov. 1, 2021); *Park Place Hosp., LLC v. Cont'l Ins. Co.*, 2021 WL 3549770, at *5 (N.D. Ill. Aug. 10, 2021) (Illinois law) ("Unlike COVID-19, which [the insured] acknowledges did not

11

render the premises completely unusable or uninhabitable, the cases finding coverage based on the presence of asbestos, mold, or other hazards generally involve persistent physical contamination that requires repair or replacement, rather than cleaning and disinfecting, to remediate.") (internal quotation marks omitted); *Kim-Chee LLC v. Phila. Indem. Ins. Co.*, __ F. Supp. 3d __, 2021 WL 1600831, at *5-6 (W.D.N.Y. Apr. 23, 2021) (New York law) (citing *Wilkin*, but distinguishing "contamination by a persistent chemical or biological agent" from "contamination that is temporary").

Even assuming that the presence of COVID-19 particles at Firenze's property caused "physical damage," there is no coverage under the Business Income provision. As noted, the provision requires a covered suspension of operations to have been "*caused by* direct physical loss of or physical damage to property *at the 'scheduled premises*.'" Doc. 85-1 at p. 37, § A.5.o(1) (emphasis added). But Firenze alleges throughout its amended complaint that it suspended operations not due to the presence of COVID-19 at its premises, but due to the Governor's closure orders. *E.g.*, Doc. 85 at ¶ 76 ("As a result of Governor Pritzker's Closure Orders, the Plaintiff was forced to halt ordinary operations, resulting in substantial lost revenues."); *see also id*. at ¶¶ 2, 5, 88, 91. And despite Firenze's assertions to the contrary in its opposition brief, Doc. 90 at 8, 11, 16, it is implausible that the Governor's decision to issue the closure orders was influenced by the presence of COVID-19 particles at Firenze's property. Indeed, the amended complaint's allegation that the closure orders "were issued because of the widespread presence of COVID-19 *throughout the Chicago metropolitan area*, resulting in contamination by the virus of numerous premises [and] damage to property *other than property at the Plaintiff's premises*," Doc. 85 at ¶ 87 (emphasis added), flatly contradicts the key premise of Firenze's COVID-19 particles theory—that the virus's presence at its own property influenced

the issuance of the closure orders. The amended complaint's allegations that COVID-19 was "omnipresen[t]" and that the safety of businesses remaining open in March 2020 depended on city- and statewide COVID-19 positivity rates, *id*. at ¶¶ 48, 61-62, further and fatally undercut Firenze's assertion in its brief that the presence of virus particles specifically at its property impacted the imposition of statewide closure orders. *See Peterson v. Wexford Health Sources, Inc.*, 986 F.3d 746, 752 n.2 (7th Cir. 2021) ("In opposing a Rule 12(b)(6) motion, [the plaintiff] was free to elaborate on his factual allegations *so long as* the new elaborations are consistent with the pleadings.") (emphasis added) (internal quotation marks omitted).

The only viable reading of the amended complaint, given Firenze's own allegations, is that the possible presence of virus at Firenze's property did not affect the Governor's decision to issue the closure orders. Because the cause of Firenze's suspension of operations—the closure orders—indisputably was not itself "caused by … physical damage" to Firenze's property, Firenze's COVID-19 particles theory fails to make out a coverage claim under the Business Income provision. Doc. 85-1 at p. 37, § A.5.o(1).

      **B.**      **Extended Business Income and Extra Expense Provisions**

The Extended Business Income provision extends, for up to thirty days, the time for which Twin City will pay for "Business Income loss payable under th[e] policy." *Id*. at p. 38, § A.5.r(1). This provision serves only to extend the scope or duration of coverage under the Business Income provision; it is not an independent trigger for coverage, and Firenze offers no argument why it would provide coverage if the Business Income provision does not. Accordingly, because the Business Income provision does not provide coverage here, neither does the Extended Business Income provision.

13

The Extra Expense provision states:

> [Twin City] will pay reasonable and necessary Extra Expense [Firenze] incur[s] during the "period of restoration" that [it] *would not have incurred if there had been no direct physical loss or physical damage to property at [Firenze's premises]* … caused by or resulting from a Covered Cause of Loss.

*Id*. at p. 37, § A.5.p(1) (emphasis added). Even assuming that the presence of COVID-19 particles at Firenze's property caused "physical damage" within the meaning of that term, Firenze's claim for coverage under the Extra Expense provision fails. The provision covers only expenses that Firenze "would not have incurred if there had been no direct physical loss or physical damage to property *at [its premises]*." *Ibid*. (emphasis added). But the closure orders would have applied to Firenze and caused it to incur the same expenses regardless of the presence of virus particles at its property. That is because, as explained above, the only plausible reading of the amended complaint is that the possible presence of virus at Firenze's property did not affect the Governor's decision to issue the closure orders. Accordingly, because Firenze would have incurred the same expenses whether or not COVID-19 particles were present at its property, its claim under the Extra Expense provision fails.

### C. Civil Authority Provision

The Civil Authority provision states:

> [Twin City's] insurance is extended to apply to the actual loss of Business Income [Firenze] sustain[s] when access to [its premises] is specifically prohibited by order of a civil authority as the direct result of a Covered Cause of Loss to property in the immediate area of [its premises].

*Id*. at p. 38, § A.5.q(1). By its terms, the provision applies only when the following events occur: (1) some property in the immediate vicinity of Firenze's premises suffers some sort of covered loss; *and* (2) some government action prohibits access to Firenze's premises as a direct result of that loss. *Ibid*.

Firenze argues that the closure orders' shuttering of the Ogilvie food court's seated dining area—which Firenze alleges is part of its premises, Doc. 85 at ¶¶ 35-36; Doc. 90 at 15—satisfies the first condition of the Civil Authority provision. Doc. 90 at 14-15. There is no need to decide whether Firenze is correct on this point because it fails to satisfy that provision's second condition.

Firenze does not allege that the closure orders were "the direct result of" COVID-19 contamination at properties in the "immediate area" of Firenze's property, as the Civil Authority provision requires. Doc. 85-1 at p. 38, § A.5.q(1). To the contrary, the amended complaint alleges that the closure orders "were issued because of the widespread presence of COVID-19 *throughout the Chicago metropolitan area*." Doc. 85 at ¶ 87 (emphasis added). That allegation fatally undercuts Firenze's submission that the Governor was reacting to the virus's presence at a particular location—let alone the location surrounding Firenze's premises—rather than implementing prophylactic measures in light of the pandemic as a whole. It necessarily follows that the Civil Authority provision provides no coverage here.

As an analogy, consider a severe blizzard sweeping through Chicago. *Cf.* Jim Allsopp, *50th Anniversary of the 1967 Blizzard—Largest Snowfall in Chicago on Record*, Nat'l Weather Serv., https://www.weather.gov/lot/67blizzard (last visited Dec. 8, 2021) (discussing the blizzard of 1967, in which 23 inches of snow and ice fell over Chicago in 24 hours, killing sixty and causing an estimated $150 million in business losses). If the weight of ice were to cause a building's roof to collapse and access to the street had to be completely closed to allow debris to be cleared, the Civil Authority provision might cover losses suffered by nearby businesses on that street. But if the entire city were to shut down prophylactically in anticipation of the blizzard, the provision would not apply. The latter scenario mirrors the COVID-19 closure

orders in this case. *See Dickie Brennan & Co. v. Lexington Ins. Co.*, 636 F.3d 683, 686 (5th Cir. 2011) (Louisiana law) (holding that civil authority coverage did not apply in the case of a hurricane evacuation order issued as a preventative measure before any property damage occurred in the vicinity).

In holding that the Civil Authority provision does not provide coverage to Firenze, this court joins the many other courts to have interpreted materially identical provisions in the same manner. *See, e.g.*, *Swordfish Fitness of Franklin, Inc. v. Markel Ins. Co.*, 2021 WL 4480509, at *6 (M.D. Tenn. Sept. 30, 2021) (Tennessee law) ("Even if Plaintiffs could show physical damage, the COVID Orders were not issued as a result of property damage, but to control the spread of the virus by limiting human interaction, particularly in large gatherings. Accordingly, the Court finds that Plaintiffs have not stated a plausible claim for coverage under the Civil Authority provision."); *Deer Mountain Inn LLC v. Union Ins. Co.*, __ F. Supp. 3d __, 2021 WL 2076218, at *11 (N.D.N.Y. May 24, 2021) (New York law) ("[A]n order, issued in response to the spread of COVID-19 throughout New York State with the goal of limiting future transmission of the virus statewide, does not fall within the scope of the Civil Authority Provision … ."), *appeal docketed*, No. 21-1513 (2d Cir. June 21, 2021); *Aggie Invs., L.L.C. v. Cont'l Cas. Co.*, 2021 WL 1550479, at *5 (E.D. Tex. Apr. 20, 2021) (Texas law) ("[T]he civil authority actions here were taken to prevent the anticipated threat of COVID-19—not because there was structural alterations or property damage at other premises. In this context, the causal link between property damage and civil authority action is missing.") (citations omitted), *appeal docketed*, No. 21-40382 (5th Cir. May 13, 2021); *Kamakura, LLC v. Greater New York Mut. Ins. Co.*, 525 F. Supp. 3d 273, 288 (D. Mass. 2021) (Massachusetts law) (holding that "[b]ecause the orders were intended to minimize future damage rather than to respond to past damage, the

complaint fails to state a claim for Civil Authority coverage," and noting that "[m]ost courts have come to the same conclusion when considering claims for civil-authority coverage based on comparable COVID-19 orders") (collecting cases), *appeal docketed*, No. 21-1259 (1st Cir. Apr. 13, 2021); *Whiskey Flats Inc. v. Axis Ins. Co.*, 519 F. Supp. 3d 231, 237 (E.D. Pa. 2021) (Pennsylvania law) ("[The plaintiff] did not close because of damage to a nearby property or because there was some dangerous physical condition at another nearby property. It closed because the Shutdown Orders applied to its own operations. Thus, its shutdown and resulting losses fall outside the scope of the Civil Authority coverage."), *appeal docketed*, No. 21-1294 (3d Cir. Feb. 18, 2021); *O'Brien Sales & Mktg., Inc. v. Transp. Ins. Co.*, 512 F. Supp. 3d 1019, 1025 (N.D. Cal. 2021) (California law) ("[I]t is apparent from the plain language of the cited civil authority orders that such directives were issued to stop the spread of COVID-19 and not as a result of any physical loss of or damage to property."); *Kirsch v. Aspen Am. Ins. Co.*, 507 F. Supp. 3d 835, 843 (E.D. Mich. 2020) (Michigan law) (denying Civil Authority coverage because the insured "failed to establish that the COVID-19 executive order was a direct result of damage to existing property as opposed to an attempt to curtail the virus's spread and future damage"), *appeal docketed*, No. 21-1038 (6th Cir. Jan. 14, 2021); *Pappy's Barber Shops, Inc. v. Farmers Grp., Inc.*, 491 F. Supp. 3d 738, 740 (S.D. Cal. 2020) (California law) ("[T]he COVID-19 Civil Authority Orders … were precautionary measures taken by the state to prevent the spread of COVID-19 in the future, and therefore not issued as a result of loss or damage to property at Plaintiffs' premises or elsewhere.") (internal quotation marks omitted). The court respectfully disagrees with those courts to have reached the contrary result. *See, e.g.*, *Studio 417, Inc. v. Cincinnati Ins. Co.*, 478 F. Supp. 3d 794, 803-04 (W.D. Mo. 2020) (Missouri law).

II.  **Section 155 Claim**

Because Firenze's claims for coverage under the Twin City policy fail, its claim under 215 ILCS 5/155 fails as well. "[S]ection 155 provides [] 'an extracontractual remedy to policy-holders whose insurer's refusal to recognize liability and pay a claim under a policy is vexatious and unreasonable.'" *Phillips*, 714 F.3d at 1023 (quoting *Cramer v. Ins. Exch. Agency*, 675 N.E.2d 897, 900 (Ill. 1996)). There is no liability under § 155 for vexatiously denying coverage if the insured was not entitled to coverage in the first place. *See Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 530 n.14 (7th Cir. 2005) ("[B]ecause we have found that … [the insurer] owed no duty to defend John … we need not analyze [the] claim that [the insurer] violated [215 ILCS 5/155], as an essential element of that claim is that [the insurer] had a duty to defend John."); *Rhone v. First Am. Title Ins. Co.*, 928 N.E.2d 1185, 1196 (Ill. App. 2010) ("Where the policy is not triggered, there can be no finding that the insurer acted vexatiously and unreasonably in denying the claim.").

III.  **ICFA Claim**

Firenze's ICFA claim alleges that Twin City's advertising was misleading in light of its denial of coverage. Doc. 85 at ¶¶ 116-119. In seeking dismissal of the ICFA claim, Twin City argues that "[b]ecause [Firenze's] business losses are not covered under the unambiguous terms of the Policy, all of [its] claims fail." Doc. 88 at 16. In its opposition brief, Doc. 90, Firenze fails to specifically address its ICFA claim, which is consistent with its acknowledgement earlier in the suit that all its claims rise or fall with its coverage claim, Doc. 33 at 15. Accordingly, Firenze has forfeited any argument that its ICFA claim can survive dismissal if its coverage claim does not. *See G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012) ("We have repeatedly held that a party waives an argument by failing to make it before the district court. That is true whether it is an affirmative argument in support of a motion to dismiss

18

or an argument establishing that dismissal is inappropriate.") (citations omitted); *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("We apply [the forfeiture] rule … where a litigant effectively abandons the litigation by not responding to alleged deficiencies in a motion to dismiss. … Our system of justice is adversarial, and our judges are busy people. If they are given plausible reasons for dismissing a complaint, they are not going to do the plaintiff's research and try to discover whether there might be something to say against the defendants' reasoning.") (internal quotation marks omitted); *see also Boogaard v. NHL*, 891 F.3d 289, 294-96 (7th Cir. 2018) (affirming the district court's holding that the plaintiffs forfeited their claims by failing to respond to the defendant's argument under Rule 12(b)(6) that they failed to state a claim).

## Conclusion

Twin City's motion to dismiss is granted. Firenze's opposition brief does not request an opportunity to replead in the event Twin City's motion were to be granted; in any event, Firenze has already been given one chance to replead and will not be given a second. Accordingly, the dismissal is with prejudice, and judgment will be entered in favor of Twin City. *See Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 335 (7th Cir. 2018) ("Nothing … in any of our cases[] suggests that a district court must give leave to amend a complaint where a party does not request it … . To the contrary, we have held that courts are within their discretion to dismiss with prejudice where a party does not make such a request … .").

December 10, 2021

_____
United States District Judge